**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (CA# 144074)
Marcel F. Sincich, Esq. (CA# 319508)
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
dalekgalipo@yahoo.com
msincich@galipolaw.com
Phone: (818) 347-3333
Fax: (818) 347-4118

**SMITH ALSTON DARNER & LEE**
John M. Alston, #023572
Jonathan D. Darner, #031498
6816 E. Brown Road, Suite 101
Mesa, Arizona 85207
Phone (602) 892-5000
Fax (602) 892-5555
john@smithalstonlaw.com
jd@smithalstonlaw.com

*Attorneys for Plaintiff Edgar Parra-Cota*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EDGAR PARRA-COTA | Case No.: **2:23-cv-02305-KML (MTM)** |
| Plaintiff, | [*Honorable Krissa M. Lanham*] |
| vs. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF PHOENIX, et al., | |
| Defendants. | (*Oral Argument Requested*) |

## I.    INTRODUCTION

Defendants used excessive and unreasonable force against Edgar Parra-Cota ("Parra"), on November 14, 2022, in the Sunrise United Methodist Church parking lot. Defendants quickly determined that there was no crime at issue—Parra was experiencing a mental health crisis. Yet, between 6:22 a.m. and 9:22 a.m., without warning, while mere communication and de-escalation was all that was necessary, Defendants repeatedly used force against Parra, who was alone in a car and was not an immediate threat to any officer or person. Now, Defendants violate Rule 26's requirement that all facts and reasonable

inferences be assumed in Plaintiff's favor, as Defendants argue facts never reported by the officers and never mentioned at deposition, use information unknown, submit "sham affidavits," and base their Motion on the false assumption that Parra was under arrest. Within minutes of arrival, prior to any force used, multiple officers and supervisors admitted on camera that *there was no crime*. (Ex 40 at 1.) The evidence shows an extreme amount of force on a mental health call with disregard for Parra's dignity and sanctity of life and rights, by plainly incompetent officers against a man who was *not an immediate threat*. (See Ex K at 1-67.) This is a display of the City's failure of policy, training, and leadership, and Officers' egregious uses of force against Parra.

## II.     UNDISPUTED FACTS PRECLUDE SUMMARY JUDGMENT

Officers are trained to de-escalate someone suffering from a mental health crisis, including controlling the tone of communication, distance, and use of bright lights. (Ex B, Majarucon Depo at 21:13-16, 70:6-15.) Officers are trained that Cover + Distance = Time, and to utilize Time to talk to communicate, call for additional resources, provide commands and warnings, and allow time for subject to comply. (*Id.* at 56:13-57:11, 76:8-24.) The goal of de-escalation is to influence the person to change their behavior, by building a rapport and trust, reducing the intensity, and slowing things down to eliminate the need to use force, rather than escalating the situation with force. (*Id.* at 83:24-84:6; Ex A, Nelson Depo at 45:23-46:2, 78:22-79:1, 81:1-7; Ex F, Paulson Depo at 79:15-22, 80:3-24, 89:8-19; Ex H, Steele Depo at 26:1-19.) Defendants define passive resistance as physical actions that do not prevent an officer's attempt to control; active resistance as physical actions that attempt to prevent, but do not involve attempts to harm; and active aggression as physical actions of assault, including an attempt to fight, punch, kick, or grab an officer. (Ex C, Bennett Depo at 55:20-56:8, 58:25-59:10, 60:7-12.) Parra never showed active aggression. (*Id.* at 60:14-61:11; see Helm Videos.) A person is only a threat if he has the ability and opportunity to harm another, who is in jeopardy—an immediate danger. (Ex B at 85:14-23, 86:7-10.) Parra was not in proximity to harm anyone; nobody was in immediate danger. (*Id.* at 86:2-15.). For force to be used against a person, officers must

have utilized all other less intrusive and feasible alternatives. (*Id.* at 87:24-88:5.) In using force, officers must recognize the sanctity for human life, use of force only when necessary; proportionate to the observed threat; and an overreaction is unreasonable force. (*Id.* at 81:8-14, 81:21-82:6, 92:13-16.) Further, a knife is only a potential threat depending on proximity and actions. If the subject is 50 feet away with a knife down by his side, i.e., not attempting to slash or stab anybody, he is not an immediate threat. (Ex F at 29:13-30:13, 52:7-9.) Generally, it is legal to carry a small knife, like Parra's. (Ex B at 44:5-12.)

Within minutes Officers knew that Parra had not threatened and was not holding anyone against their will. (Ex 10 at 00:50-3:00, 4:30-4:35.) Officers knew the two women did not see Parra with a gun. (*Id.* at 03:20-05:00.) Parra did not have a gun in the car. (Ex J, Parra Depo at 59:12-13.) Defendants clearly knew Parra had not committed a crime and also knew that this was a mental health crisis call. (Ex 10 at 6:45-7:26, 9:05-16, 14:04-18, 19:05-20.)

The 26-year-old Parra was only 5'7" and under 200 lbs., experiencing a mental health crisis. (Ex. G, Peyton Depo at 38:10-17.) Parra was alone in his car. (Ex A at 21:13-15.) There were as many as 30 officers on scene in total who set a perimeter around Parra to prevent him from getting out. (Ex. B at 26:24-27:3, 67:22-68:20.) Defendants repeatedly failed to give warnings prior to using force. (Ex A at 17:20-24; Ex C at 19:2-5; Ex B at 115:12-15; Ex D, Nevin Depo at 32:24-33:1; Ex E, Burpee Depo at 73:9-12; Ex F at 64:1-3, 65:15-17; Ex G at 62:21-63:5.) Parra never attempted to flee and never attempted to run or move towards any bystander or neighborhood. (Ex A at 20:11-13; Ex C at 22:9-12; Ex B at 63:8-10; Ex D at 32:3-5; Ex F at 31:21-23; Ex G at 46:3-6, 47:6-12.) Parra never attempted to harm, punch, kick, grab, slash, stab, or even point a knife at anybody; and never made any furtive or threatening movement with a knife towards anybody. (Ex A at 26:4-13; Ex C at 17:1-9, 21:19-21; Ex B at 37:11-21, 45:21-24, 135:4-9; Ex D at 19:17-19, 20:7-9, 28:4-6; Ex E at 46:7-10, 51:8-13; Ex F at 28:16-18, 30:15-18, 66:12-13; Ex G at 37:12-17, 54:2-23.) Parra never attempted to run, lunge, or walk towards any officer. (Ex A at 14:10-14; Ex C at 22:4-7; Ex B at 47:4-7; Ex D at 28:7-9; Ex E at 51:2-7; Ex F at

62:8-10.) Parra never verbally threatened any officer. (Ex A at 17:6-8; Ex C at 21:9-11; Ex B at 47:20-22; Ex D at 19:20-20:16; Ex E at 51:16-18; Ex F at 27:25-28:9; Ex G at 37:18-30:5; Ex H at 57:16-19.) Parra complied with commands to exit the car prior to being shot with a 40mm round (Ex A at 61:1-6); and complied with commands by exiting the driver's window of the car, _unarmed_, prior to being shot by several officers with 37mm rounds (Ex F at 61:16-62:1.) Officers escalated by pinning the car in on all sides. (Ex C at 44:2-6; Ex F at 82:20-83:15.) Despite Parra communicating with negotiators (Ex F at 41:16-19 86:8-87:2; Ex 20 at 01:57-02:09), Nelson deployed one 40mm round (Doc. 84, Mot. 2:19-20); Majarucon deployed numerous pepper ball rounds (_Id_. 2:22-3:1); Roberts deployed two OC spray canisters (_Id_. 3:5-6, 10); Bennett deployed three 40mm rounds (_Id_. 3:11-12); Nevin and Burpee deployed Tasers (_Id_. 3:23); Paulson deployed three 37mm rounds (_Id_. 5:8-16); Peyton deployed two 37mm rounds (_Id_. 5:13-14); Steele deployed two 37mm rounds, one to the face (_Id_. 5:19-23, 6:3-4); and gas was deployed in the car (Ex G at 46:20-25.) Based on these undisputed facts alone, Parra was obviously not an immediate threat to anybody, and Defendants' Motion for Summary Judgement should be denied in full.

## III. DISPUTED ISSUES OF MATERIAL FACT MUST PRECLUDE SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

Parra did engage and even complied with several officers' commands. (See, e.g., Ex F at 41:16-19, 86:8-87:2; Ex 20 at 01:57-02:09.) Parra only waved the knife to disperse the assault of PAVA irritant that was preventing him from breathing adequately. (Ex B at 46:17-22, 88:9-25.) Parra did exit the car in compliance several times, but force was used anyway. (Ex A at 61:1-6; Ex F at 61:16-62:1.) Defendants did not continually attempt to de-escalate; video show Officers repeatedly escalating the situation in their tone, position, and repeated uses of force. (Ex N-Y, Helm Videos.) Parra never advanced threateningly towards officers, but was non-threatening, walking slowly, only took 1 step, and was not moving in the direction of any officer, from 60 feet away. (Ex A at 8:2-20, 11:10-21; Ex 11 at 16:20-16:25; Ex R, Helm Video, Bennett Force.) Parra was in the front passenger seat, covering his face with his sweater to block the barrage of PAVA rounds when Roberts

first emptied a canister of MK-9 in his face. (Ex S, Helm Video, Roberts Force.) Parra was shot in the groin. (Ex V, Helm Video, Peyton Force). The rounds had an effect as Parra physically and verbally reacted in pain to being shot every time. (Ex N-Y, Helm Videos.) Parra never jumped onto a patrol vehicle and never attempted to escape or break containment; Parra complied with officer commands to crawl out of the window and onto the hood of the Tahoe, and Parra could not see or breathe and was disoriented from the billowing CS gas. (Ex U-X, Helm Videos, Paulson, Peyton, Steele Force.) Parra never ran across the roof towards Ghan – Parra could not see and merely went opposite the force used on him while visibly unarmed in compliance with commands. (*Id.*) Steele aimed for Parra's face and struck him in the face after Parra expectedly slipped from the chemical irritants and fell prone on the roof of the car. (Ex X, Helm Video, Steele Force.) There is no evidence that Parra hit his head on the car door or landed on his face, instead it is clear Steele shot Parra in the face and Parra landed face up on the ground. (*Id.*) Parra never raised his visibly empty hand at Steele to throw anything while unconscious from Steele's shot to his face. (*Id.*) Steele's second round was not to stop Parra – Steele maliciously walked up and shot the unconscious and unarmed Parra on the ground. (*Id.*)

## IV.    LEGAL STANDARD FOR RULE 56 MOTIONS

Summary judgment is only appropriate when there is no genuine issue of material fact, which is Defendants' burden. Fed. R. Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A Court's function is not to weigh evidence, make credibility determinations, or determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if its proof or disproof is essential to an element of Plaintiff's case. *Celotex Corp.*, 477 U.S. at 322-23. A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Entirely circumstantial evidence is sufficient to create a triable issue. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992). Based on the disputed issues of material fact, Defendants' Motion should be denied in full.

Further, the reasonableness of an officer's belief "is a quintessentially 'fact-

specific' question, not a question that judges should try to answer 'as a matter of law.'" *Brosseau v. Haugen*, 543 U.S. 194, 206 (2004) (Stevens J., dissenting); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003). Here, the Court must view the evidence and draw all reasonable inferences in the light most favorable to Parra. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987). "A justifiable inference is not necessarily the most likely inference or the most persuasive inference. Rather, an inference as to another material fact may be drawn in favor of the nonmoving party...if it is rational or reasonable." *United Steelworks of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (internal citations omitted). The record is viewed in light most favorable to Parra, so long as it is not blatantly contradicted by the video evidence. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007). A reasonable factfinder could even draw divergent conclusions from the videos. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1132-39 (9th Cir. 2019); *Glenn v. Washington Cnty*, 673 F.3d 864, 878 (9th Cir. 2011). Here, undisputed video evidence shows no crime, no threat, no warning, and no attempt to flee.

Finally, Summary judgment is a drastic remedy and therefore trial courts should act "with caution" in granting summary judgment. *Anderson*, 477 U.S. at 255. Because the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom...summary judgment...should be granted sparingly" in excessive force cases. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Further, this Circuit reaffirmed that "summary judgment is not appropriate in §1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Nehad*, 929 F.3d at 1133 (noting genuine doubts of officer credibility compared to other evidence).

## V. REPEATED FORCE, WITH NO WARNING, CRIME, FLIGHT, THREAT, OR ASSAULT ON A MENTALLY ILL SUBJECT IS EXCESSIVE

Defendants' use of force is analyzed under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he

6

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The test applies "the clear principle that the force used to make an arrest must be balanced against the need for force." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) (*citing Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)). It is a careful balance of "the nature of the harm and quality of the intrusion" on Parra's rights "against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010); *see also Scott*, 550 U.S. at 383-84; *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). The inquiry begins by assessing both the type and amount of force used. "[A]ll force—lethal and non-lethal—must be justified by the need for the specific level of force employed." *See Bryan*, 630 F.3d at 824-25; *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Here, it is undisputed that Officers repeatedly shot Parra with less-lethal force, <u>including to the groin and face, which was deadly force</u>. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1117-19 (9th Cir. 2005). It is well-established that deadly force is "extreme," unmatched, and should only be used in limited circumstances. *Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). "[D]eadly force is the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.* (quotations and citations omitted). Thus, Peyton and Steele's force cannot be understated.

Despite Defendants' argument to the contrary, the Ninth Circuit has long held that less-lethal force must also be necessary, even if there is probable cause to arrest. *See Graham*, 490 U.S. at 396-97; *see Blankenhorn*, 485 F.3d at 479-80 (holding that the takedown, restraint, and punches were not justified); *Headwaters Forest Def. v. Cnty of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("Because the officers had control…it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control"). Further, an impact rounds is "intended to induce compliance

by causing sudden, debilitating, localized pain,…is considered a 'less-lethal' weapon, as opposed to a non-lethal weapon, because [direct impact munitions] can cause serious injury or death if they hit a relatively sensitive area of the body, such as the eyes, throat, temple or groin. *Glenn*, 673 F.3d at 871-72 (citation omitted). The euphemism to downplay the seriousness of these munitions "grossly underrates the dangerousness of this projectile, which can kill a person if it strikes his head…under fifty feet." *Id.* (referencing fractures and loss of an eye from being shot with a beanbag gun). "In light of this weapon's dangerous capabilities, such force, though less than deadly, is permissible only when a strong governmental interest compels the employment of such force." *Id.*

The government interest factors include (1) the severity of crime at issue; (2) the immediacy of the specific threat; (3) whether there is active resistance or attempt to evade, *Graham*, 490 U.S. at 396; (4) the availability of alternative methods, *Smith*, 394 F.3d at 701; (5) whether a warning was given, *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012); and (6) whether the subject was apparently emotionally disturbed, *see Glenn*, 673 F.3d at 872; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). None of the government interests support any of the force use here.

First, the severity of the crime at issue – in Defendants' own words, there was crime. (Ex 10 at 14:04-07, 19:10-15; Ex 11 at 03:40-45, 7:16-20; Ex 12 at 8:22-42.) Defendants cannot create a crime after the fact to justify their force. *See, e.g.*, *Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1175 (C.D. Cal. 2022); *cf. Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) (driving intoxicated is serious but does not present a risk of danger to arresting officer). Thus, the officers were not responding to a serious crime at the time of the force. *Cf. Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (analyzing only the initial crime the subject was seized for – not any later alleged crime). Thus, this factor weighs in favor of finding that the Officers' use of force was excessive. *See*, *e.g.*, *Deorle*, 272 F.3d at 1283 (govt. interest diminished when no serious crime).

The most important (second) *Graham* factor is, for less lethal force, whether the subject posed an immediate threat of harm to others, and for deadly force, whether the

subject posed an immediate threat of death or serious physical injury to safety. *Smith*, 394 F.3d at 702; *see Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1126 (9th Cir. 2021); *see also Zion v. City of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). The fact that a suspect was armed with a deadly weapon does not render the officers' response reasonable. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Glenn*, 673 F.3d at 872-73; *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991). The use of force is only permissible in the most limited circumstances; it must be necessary. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). "A simple statement by an officer that he fears for his safety or the safety of others is not enough" nor is an officer's "desire to resolve quickly a potentially dangerous situation." *Deorle*, 272 F.3d at 1281. Parra did not pose an immediate threat to the safety of any officer or person. (Ex Z, DeFoe Decl ¶24; Ex J at 85:18-86:9.)

Next, <u>video evidence shows that Parra was not actively resisting arrest or attempting to evade arrest by flight</u>. (Ex N-Y, Helm Videos.) Parra was not even under arrest, yet still <u>complied with several commands</u>. (Ex N, O, U, Helm Videos; *See Lopez v. Gelhaus*, 871 F.3d 998, 1006-07 (9th Cir. 2017). Further, a jury could find that all actions of the mentally ill Parra while unjustifiable force was being used against him consistent with a reasonable response to Defendants' provocative excessive force. *See Young v. County of Los Angeles*, 655 F.3d 1156, 1164 (9th Cir. 2011); *Blankenhorn*, 485 F.3d at 479-80. It is undisputed that Parra never attempted to flee. Furthermore, <u>Officers ignored numerous less-intrusive alternatives</u>, such as continuing to use verbal commands and de-escalation. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (quoting *Smith*, 394 F.3d at 701). No force was necessary to seize the non-resistive Parra. (See Ex Z, DeFoe Decl ¶24; *See Glenn*, 673 F.3d at 872; *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014). <u>Additionally, before every use of force, officers must give a warning, if feasible.</u> *Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022). Here it is <u>undisputed that no warning was given</u> by any Defendant even though it was feasible. (Ex Z, DeFoe Decl ¶24); *See Lopez*, 871 F.3d at 1007.

1     Finally, whether Parra was emotionally disturbed is an important factor that "must
2    be considered." *See Deorle*, 272 F.3d at 1283. The tactics to be employed against an
3    emotionally distraught individual are ordinarily different and that increasing the use of
4    force may exacerbate the situation. *Id*. at 1282-83. "In the case of mentally unbalanced
5    persons, the use of officers and others trained in the art of counseling is ordinarily
6    advisable, where feasible, and may provide the best means of ending a crisis." *Id*. at 1283;
7    *see*, *e.g*., *Ramsey v. City of Lake Havasu City*, No. CV-20-08189-PCT-DLR (ESW), 2023
8    WL 6295189, at *13 (D. Ariz. Sept. 27, 2023); *Strickland v. Nevada Cnty.*, 69 F.4th 614,
9    619 (9th Cir. 2023). All the reasonableness factors weigh heavily in favor of Plaintiff and
10   in favor of denying Defendants' Motion for Summary Judgement in full.

11       **A.    Officers Nelson and Bennett Used Excessive Force Without Warning
12               From 60 Feet, Against the Non-Threatening Parra with 40mm Rounds**

13       Disturbingly, Defendants' irrational fears led to their plan to use deadly force
14   against Parra where multiple offices even had their fingers on the trigger in the process of
15   pulling it to the rear. Parra was 60 feet away, took only one step, moving slowly, and not
16   threatening anybody with the knife. Deadly force would have been egregious, which shows
17   Defendants' unreasonableness and lack of training and supervision. (Ex K at 1-4.)

18       Defendants' reliance on *Hart v. Redwood City*, 99 F.4th 543 (9th Cir. 2024) is
19   misplaced. There, the subject was attempting suicide, officers "found the man's wife
20   covered in blood and frantically pleading for help," the subject "began moving towards
21   [officers] while raising the knife," a Taser deployment was attempted, the subject was
22   "approaching closely and wielding a knife," and importantly, the subject "came towards
23   them at a slow run," and was "only a few feet from the officers" when the shots were fired.
24   *Id*. at 545-46. *Hart* presents an entirely different case; a knife being the only similarity, but
25   the threat drastically different. Here, Parra was moving slowly, took only one step, was not
26   walking towards officers, did not raise the knife in the direction of officers, was 60 feet
27   away, and his girlfriend was not frantic or injured but calm and safe when officers arrived.

28

Impact weapons are significant uses of force that should only be used as a response to aggressive or combative acts. *Young*, 655 F.3d at 1162. Here, Parra was neither aggressive nor combative. The Ninth Circuit's "conclusion comports with the logical notion that it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety." *Id*., at 1166-67. Similarly, the 40mm shots in response to Parra's claimed "failure to obey an order would be 'plainly in excess of the force necessary under the circumstances,' and thus excessive under the Fourth Amendment." *Id*. at 1167 (*quoting Headwaters*, 240 F.3d at 1131); *cf. Thompson v. City of Chicago*, 472 F.3d 444, 451 & nn. 18-19 (7th Cir. 2006) (describing policies limiting "impact weapons" to "high-risk assailants" who pose a serious threat).

### 1.    Officer Nelson's Use of Excessive Force

Within minutes of arrival, Nelson knew there was no crime. (Ex A at 35:12-36:3, 38:1-11, 42:19-23.) Thus, Nelson admitted he would be very limited in what he could do with the 40mm. (*Id*. at 39:21-40:4.) Nelson knew Parra was experiencing a mental health crisis, had schizophrenia, was off his medication, and had not slept in 2-3 days. (*Id*. at 20:20-23, 23:3-10, 29:10-18.) Nelson had no information that Parra had ever physically injured anyone, verbally threatened anyone, or had a violent history. (*Id*. at 24:2-9.) Nelson never saw Parra attempt to harm anyone, never saw anything that looked like a gun and had information that there was no gun. (*Id*. at 22:1-7, 26:4-13.) Parra never verbally threatened any officer. (*Id*. at 17:6-8.) There was no probable cause to arrest Parra. (*Id*. at 19:15-19.)

A team was assembled to respond to Parra. (*Id*. at 9:4-19.) Nelson knew the 40mm was a source of pain compliance designed to cause sufficient pain to change a subject's behavior. (*Id*. at 30:7-17.) Yet, Nelson informed the team that if Parra attempted to leave the area or come towards officers, he would shoot him with the 40mm. (*Id*. at 9:22-25.) In contradiction, Officer Armstrong commanded Parra to walk towards officers. (*Id*. at 12:5-

6, 36:16-18, 41:11-14, 42:6-13.) Roberts knew of this set up when Nelson asked, "how much leash" he should give Parra prior to shooting him. (*Id*. at 46:8-47:1.)

Nelson admits that the mentally ill Parra at least partially complied prior to the use of force. (*Id*. at 61:1-6.) At 6:22 am, Parra exited the car in compliance; shut the door; asked to speak to his sister; officers commanded, "walk towards us"; approximately one second later, Parra took one slow step toward the font of his car in compliance, looking down towards to the car; then Nelson fired one 40mm round striking Parra in the abdomen; followed by Parra bending over in pain. (*Id*. at 8:2-20, 11:10-21; Ex 11 at 16:20-16:25; Ex R, Helm Video, Bennett Force.) Parra was approximately 20 yards away with his hands down by his side, while Nelson was behind cover. (Ex A at 12:12-14, 13:7-9, 14:23-25.) Parra was giving the impression that he was going to drop the knife and surrender. (*Id*. at 24:2-14.) Parra was not running or lunging; was not walking towards officers; and had only taken one slow step before Nelson opened fire. (*Id*. at 13:22-25, 14:10-17, 15:24-16:6.) Immediately after being hit, Parra retreated into the car in fear the officers were going to kill him. (*Id*. at 30:19-21; Ex 11 at 16:50-16:53; Ex 29 at ¶31; Ex J at 72:18-73:19.) Officers may not use force against a person standing with a knife who is not threatening anyone. (Ex A at 50:15-19, 51:10-14.) The subject must be at least actively resistant for the 40mm use to be permissible. (*Id*. at 52:22-53:15.) Which was clearly not the case here. Officers are trained to give commands and warnings, and an opportunity to comply prior to using force, when feasible. (*Id*. at 54:11-55:1.) Yet, Nelson did not give Parra any commands or warning. (*Id*. at 17:20-24.) Nelson also admits that a reasonable alternative was to have Parra remain in the car and calm down. (*Id*. at 53:16-21.) Finally, Nelson never saw Parra attempt to flee. (*Id*. at 20:11-13.) Every *Graham* factor weighs heavily towards finding that Nelson used excessive force against Parra. (Ex N, Helm Video, Nelson Force; Ex Z, DeFoe Decl ¶10.)

### 2. Officer Bennett's Use of Excessive Force.

Bennett arrived at 6:35 am knowing Parra was experiencing a mental health crisis. (Ex C at 20:3-16, 74:20-23.) Bennett had no information that Parra had ever verbally

threatened anybody or ever physically harmed anybody, had never heard Parra verbally threaten anybody, and never saw Parra physically harm anybody, including never seeing Parra attempt to harm, lunge towards, punch, kick or grab anybody. (*Id*. at 21:9-22:7.) Bennett never saw Parra do anything threatening towards anyone with the knife prior to using force. (*Id*. at 17:1-9.) Bennett never saw Parra with a gun or anything that looked like a gun. (*Id*. at 18:5-10.) Parra was not physically fighting officers during the incident. (*Id*. at 56:12-16.) Further, Bennett never saw any bystanders within 40 yards of the car and knew residents in the area either were sheltered in place or had left. (*Id*. at 27:21-24, 41:21-42:2.) Bennett did not make any indication of fearing that Parra would flee or enter someone's home in either of his reports, Parra never attempted to enter someone's home, and Parra was surrounded and contained by as many as 25 officers. (*Id*. at 28:17-22, 30:6-9, 30:19-22, 40:14-41:1, 41:3-7, 71:13-72:2, 73:8-11.) Parra was alone inside the car. (*Id*. at 40:3-9.) A jury could find Parra was not a threat of harm to anyone.

As far as Bennett knew, "there was no plan." (*Id*. at 14:18-23.) But Bennett knew that approximately 50 pepper ball rounds were already deployed and saw Parra having difficulty with the chemical irritants when he used force. (*Id*. at 10:16-23, 11:14-19, 12:18-21, 34:13-19.) Parra was merely sitting in the car with the driver's door open when, from behind cover, Bennett fired three 40mm launcher rounds at Parra. (*Id*. at 8:10-14, 9:8-17, 9:25-10:12, 13:24-14:1.) It is possible Bennett also shot Parra in the crotch with a 40mm round. (Ex R, Helm Video, Bennett Force at 00:07-23); Ex 36, Attach. C at 3; Ex C at 42:18-43:5, 83:10-84:2.) Bennett did not give any commands or warning prior to using force. (*Id*. at 18:22-25, 19:2-5.) Bennett also never saw Parra attempt to flee. (*Id*. at 22:9-12.) Every *Graham* factor weighs heavily towards finding that Bennett used excessive force against Parra. (Ex O, Helm Video, Bennett Force; Ex Z, DeFoe Decl ¶12.)

## B. Officer Majarucon Used Excessive Force by Deploying 60 Pepper Balls, Without Warning, While Parra Was No Threat to Harm Any Person

The Ninth Circuit has "rejected the contention that the use of pepper spray is a 'minimal' intrusion, due to the immediacy and 'uncontrollable nature' of the pain

involved." *Nelson*, 685 F.3d at 878; *United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999) (finding pepper spray is a dangerous weapon capable of inflicting serious injury); *Young*, 655 F.3d at 1161 (intermediate force capable of inflicting significant pain); *Morales v. Fry*, 873 F.3d 817, 827 (9th Cir. 2017) (significant intrusion on liberty interests). Chemical irritants commonly, as here, make it hard to breathe and see, cause a burning sensation, coughing, panic, stress, pain, nausea, and lightheadedness, with powder bursting everywhere. *See*, *Clement v. Gomez*, 298 F.3d 898, 902 (9th Cir. 2002); Ex J at 74:12-75:1.

Like *Hart* above, Defendants reliance on *City & Cnty. of San Francisco. v. Sheehan*, 575 U.S. 600 (2015) is misplaced. The dispositive facts in a knife case, related to the immediacy of a threat factor, are (a) the distance to the, (b) what the subject is doing with the knife, and (c) how fast the subject is moving. There, the subject "became violent," stated, "I'll kill you if I have to," approached the officers yelling "I am going to kill you," and they were in an enclosed room only a few feet away. *Id*. at 604-06. Here, on the other hand, Parra was alone in the car, not being violent, not being threatened, no crime, and far from officers. Where the subject is suspected only of a minor offense, not resisting, does not pose any apparent threat to officers or the public safety, and no warning was given, the use of chemical irritants in response to Parra's claimed "failure to obey an order would be 'plainly in excess of the force necessary under the circumstances,' and thus excessive under the Fourth Amendment." *Young*, 655 F.3d at 1167 (quotation omitted).

Majarucon responded at about 6:19 am, without lights and sirens, knowing that Parra was "mentally disturbed" and that there was "no crime." (Ex B at 26:1-11, 32:8-13, 71:15-16, 108:4-11.) Majarucon knew that Parra was not refusing to let his girlfriend out of the car and did not seek additional information. (*Id*. at 36:8-11, 42:4-12.) Majarucon knew that Nelson had already used force. (*Id*. at 38:20-22.) Majarucon had no information that Parra had ever harmed or attempted to harm anyone, ever threatened anyone, or had a history of violence. (*Id*. at 37:11-21, 40:12-15, 45:21-24, 135:7-9.) Majarucon never heard Parra verbally threaten any officer and never knew anything about a gun and never saw a

14

firearm. (*Id*. at 34:16-18, 35:17-19, 47:20-22.) Majarucon knows proximity makes a difference in the potential threat of a person with a knife because they would need to be close to harm someone. (*Id*. at 52:10-20.) Majarucon never saw Parra attempt to get close to anyone and was not being aggressive towards anyone. (*Id*. at 47:9, 52:21-23, 54:17-55:3, 72:2-4, 107:6-9, 135:4-6.) Parra never attempted to drive away or flee and never attempted to run at anyone with the knife. (*Id*. at 47:4-7, 63:1-10, 103:10-12.)

Prior to using force, Majarucon did not know if any officer attempted to build a rapport with Parra and did not attempt to do so himself. (*Id*. at 57:20-25.) Majarucon did not give any commands or warnings prior to using force. (*Id*. at 58:21-60:1, 115:12-15, 120:3-6, 121:14-19.) It was an option to continue talking to Parra and trying to build a rapport instead of using force. (*Id*. at 137:3-138:3.) Majarucon was trained that the use of pepper ball could cause fear, the purpose of which is to impact a surface and burst into a cloud onto the subject. (*Id*. at 64:19-24, 83:1-23.) The concentration of the irritant is increased when deployed inside a smaller compartment, causing an irrepressible cough, difficulty breathing and seeing, tightness of the respiratory system, involuntary closing of eyes, nose runs tremendously, "incapacitating," "very strong burning," itching, and makes it "hard to focus." (*Id*. at 88:9-89:15, 90:16-22; Ex D at 59:5-23; Ex E at 36:19-37:17.)

Majarucon "never really saw" Parra prior to using force. (Ex B at 39:15-20.) Nevertheless, from behind cover, Majarucon deployed over 60 pepper balls at Parra from three different locations. (*Id*. at 10:8-11:3, 11:4-10, 51:24-52:1; 94:18-102:23; Exs. 3-4 to Depo.) Majarucon claimed to assess between rounds to see if it was necessary to continue deploying. (*Id*. at 65:19-21.) Majarucon understood that Parra was feeling the effects of the rounds after the first volley and saw Parra hold his jacket to shield himself from the irritant. (*Id*. at 73:2-8, 74:7-14.) Officer Imdorf laughed watching Majarucon deploy his first volley of pepper ball as Parra began "flailing his arms" in reaction to the rounds, including whimpering and crying. (*Id*. at 46:17-22, 48:6-19, 115:24-116:6.) Parra was still feeling the effects of the pepper balls prior to the last volley of pepper balls being deployed.

(Ex C at 35:19-36:6.) Several officers could feel the effects from the "cloud of PAVA" and were coughing from 20 yards away. (Ex B at 49:19-50:8; Ex E at 13:9-11, 13:22-25.)

Accepting all facts and reasonable inferences in Plaintiff's favor, every *Graham* factor weighs heavily towards finding that Majarucon used excessive force against Parra. (Ex P-Q, Helm Video, Majarucon Force; Ex Z, DeFoe Decl ¶11.)

### C.    Officers Nevin and Burpee Used Excessive Force by Simultaneously Tasing Parra Without Warning While He Was Not a Threat of Harm

The Ninth Circuit has held that the deployment of the taser in dart-mode "constitute[s] an intermediate, significant level of force." *Bryan*, 630 F.3d 826. When the Taser darts penetrate a person's skin, "[t]he electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." *Id*. at 824; *Mattos v. Angarano*, 661 F.3d 433, 448-49 (9th Cir. 2011) (*citing Bryan,* 630 F.3d at 824). The Ninth Circuit has considered continuous or repeated Taser applications on a contained, non-threatening subject constitutes excessive force. *Jones v. LVMPD*, 873 F.3d 1123, 1130-31 (9th Cir. 2017).

On arrival Nevin saw Parra alone in the car and discovered from the girlfriend that there was no gun involved and no kidnapping. (Ex D at 13:10-20, 38:21-39:2.) Nevin knew "that they had no crime at the time." (*Id*. at 14:21-24.) Nevin assessed, based on 20 years' experience, that Parra could have been in a mental health crisis. (*Id*. at 28:19-25; 29:11-22, 31:2-4.) Nevin had no information about whether Parra had a history of drug or alcohol use or whether Parra was under the influence at the time; no information as to criminal history; no information that Parra never physically harmed or verbally threatened anyone; never saw Parra attempt to take a hostage or receive a report that anyone saw Parra attempt to take a hostage; never saw Parra attempt to harm anyone; and never saw a gun or anything that looked like a gun. (*Id*. at 19:9-24, 20:7-9, 27:20-25, 28:1-9.) Nevin never heard Parra verbally threaten anybody and never saw him attempt to flee. (*Id*. at 20:14-16, 32:3-5.) Parra was alone in the car with no one near him. (*Id*. at 32:6-13.) Burpee told the other officers that Parra "was displaying behavior similar with having a mental health

1    diagnosis." (Ex E at 45:10-24.) Burpee cannot recall if she received information that Parra

2    had a mental health diagnosis, whether Parra was a "918," whether Parra ever physically

3    harmed anyone, whether she learned that Parra did not hold his girlfriend hostage, whether

4    there was no crime at the time, whether Parra had a criminal history, whether Parra ever

5    ran or lunged at any officer, whether Parra attempted to slash or stab any officer, whether

6    Parra attempted to punch, kick or grab any officer, whether Parra ever verbally threatened

7    any officer or whether Parra ever held the knife up to his neck. (*Id.* at 45:25-46:13, 51:2-

8    21, 53:12-24.) To Burpee, Parra was under arrest, but she does not know for what crime.

9    (*Id.* at 71:20-24.) By reasonable inference, Parra was not a threat and there was no crime.

10        A person alone in a car, even if yelling incoherently, moving from seat to seat,

11    flailing their arms, and holding a knife to his own throat, is "not resistance." (Ex D at

12    43:11-21, 44:2-20.) The Taser may only be used on a subject displaying "active

13    resistance," or if the subject is going to hurt himself or someone else. (*Id.* at 56:15-57:1.)

14    For Nevin, the "lawful object of the force" was "to intervene in a suicide or self-inflicted

15    injury." (*Id.* at 46:23-47:5.) However, Parra was not inflicting any self-harm at the time of

16    the Taser deployments. (*Id.* at 47:11-13, 49:16-22.) "Tasers may not be deployed…for

17    coercion or intimidation." (Ex 28 at ¶40.) Still, Sgt. Beauchamp created the Taser action

18    team with Nelson on the shield for cover, and Nevin and Burpee with Tasers, who "were

19    instructed to deploy our Tasers a Edgar after we approached the vehicle." (Ex A at 31:2-

20    4; Ex D at 39:11-15; Ex 28 at ¶39.) Nevin, "[t]ruthfully, [] didn't think [the Taser plan]

21    was going to work," was not trained for it, as "that was the first time [he had] ever done

22    anything like that." (Ex D at 35:4-14.) Officers were trained to avoid repeated applications

23    of the Taser because they could cause unnecessary harm and it is common sense that

24    simultaneous Taser deployments should be avoided and is "extreme." (*Id.* at 51:18-52:21.)

25    The Taser can cause serious bodily injury, including if a person has a knife, because the

26    subject could fall and be impaled. (*Id.* at 57:6-58:13.) Further, Nevin was trained in dealing

27    with persons potentially suffering from a mental illness, to "try to talk them down, calm

28    them down, offer them services,…take them somewhere to get them some help" and call

for assistance; and nothing else, including using force against them to instigate a response. (*Id*. at 61:19-62:6.) A person suffering from a mental illness should be given more time to understand and comply with commands, while officers maintain a safe distance to communicate but close enough to intervene if necessary. (*Id*. at 62:7-23.) Still, no commands or warnings were given to Parra. (Ex D at 32:24-33:1; Ex E at 73:9-12.)

As the officers approached with cover, Beauchamp commanded, "Taser, Taser, Taser," then the officers simultaneously deploy their Tasers. (Ex D at 40:5-11, 68:3-25.) Defendants used force on command, not a threat assessment. (*Id*. at 11:19-24, 40:12-16.) Nevin did not know what Beauchamp was looking for to give the order to deploy the Tasers because Nevin knew they were too far away. (*Id*. at 40:17-19.) The team was about 28 feet from Parra and too far to be effective, so they claim only one of four probes hit Parra – as the further the distance, the wider the spread. (*Id*. at 40:20-25, 45:2-13, 54:17-19; Ex A at 32:3-20; Ex E at 71:1-5.) Parra was merely sitting in the car with the door open when simultaneously Tased. (Ex A at 32:21-23; Ex E at 9:21-24, 10:7-20.) *Then*, Parra closed the car door. (Ex A at 33:19-21; Ex C at 54:6-9; Ex D at 69:9-11; Ex J at 69:19-70:6.)

Nevin had only used the Taser one time "many years ago," on a dog – and even then, it did not work. (*Id*. at 35:15-18.) Nevin did not even know the model Taser despite being equipped with it for several years. (*Id*. at 53:16-20.) Burpee had no Taser training, no use of force, de-escalation, crisis communication, or mental illness training in the two years prior to the incident. (Ex 28 at ¶¶8, 10.) Other than training, this was the first time Burpee deployed the Taser. (*Id*. at ¶50.) With proper training, the Taser will cause neuromuscular incapacitation. (Ex D at 55:1-4, 55:22-25.) Accepting all facts and reasonable inferences in Plaintiff's favor, every *Graham* factor weighs heavily towards finding that Nevin and Burpee used excessive force against Parra. (Ex T, Helm Video, Tasers Deployed; Ex Z, DeFoe Decl ¶¶14-15.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.    Officers Paulson, Peyton and Steele used Excessive Force without Warning against the Compliant and Unarmed Parra with 37mm rounds**

SAU deployed CS gas, which is a use of force to make the environment so unbearable that Parra would exit the car quickly. (Ex F at 31:16-20, 40:15-21, 56:21-57:2.) The CS gas causes eyes to involuntarily shut, difficulty breathing and seeing, burning sensation, airway irritation, and uncontrolled coughing. (Ex F at 18:18-19:10, 63:21-23; Ex H at 20:7-13.) Defendants gassed the compliant and unarmed Parra out of the car then shot 37mm rounds at him while his eyes were involuntarily shut and had difficulty breathing, including to the groin, face, unauthorized targets causing serious bodily injury, and while he was on the ground unconscious. As the primary ARWEN operator, Paulson was charged with providing training on its use. (Ex F at 76:10-77:1.) The ARWEN is a five-shot rotary launcher, capable of deploying 37mm baton impact rounds 242 fps/165 mph with an accuracy group of 8-12 inches at 25 yards, designed to deliver pain and create psychological and physiological effects. (*Id*. at 77:2-18; Ex H at 33:1-6.) The ARWEN rounds cause fear, distrust, and trigger a flight or fight response. (Ex F at 78:12-79:13.) Officers may not target the head, neck, spine, and thorax because those are potentially life-threatening targets, and Officers can only target these areas if deadly force is authorized. (*Id*. at 66:25-67:8, 68:19-24; Ex H at 33:20-25.) Officers may only target the back, buttocks, arms, legs, and lower abdomen. (Ex F at 66:17-24.) Each ARWEN was equipped with a red dot sight for accuracy. (*Id*. at 51:10-15.)

Peyton heard radio traffic and responded on his own, knowing the subject was armed with a knife and was possibly a mental health subject. (Ex G at 33:15-34:6.) For SAU, Peyton arrived first and "was in charge of making some initial set-up decisions and deciding about which resources could benefit the team to allow for a safe resolution." (*Id*. at 25:14-22.) Supervisors briefed Peyton on what previously occurred, including that Parra was in the car, less-lethal had been deployed, a K-9 was on scene, and CIT was attempting to talk to him. (*Id*. at 35:2-8, 34:18-23.) The brief did not include information that Parra tried to flee or why the officers used force against Parra. (*Id*. at 46:3-6, 83:24-84:6.)

Parra's supposed requirement to comply was predicated on the false assumption that kidnapping and domestic violence was being investigated. (*Id*. at 44:8-11.) Yet, Peyton never saw any domestic violence or kidnapping, does not know if any officer saw the same, admitted that SAU does not investigate the same, and did not receive information that there was an investigation of the same. (*Id*. at 44:12-16, 45:2-9, 103:22-104:2, 107:16-20.) Moreover, Peyton asked the reporting Lieutenant <u>if there was a crime</u>, to which the Lieutenant indicated "**no**," there was no hostage, but that Parra was schizophrenic having an episode. (*Id*. at 100:7-101:9; 105:6-14; Ex 18 at 00:55-01:14; (Ex G at 101:10-24, 105:18-106:1.) The Lieutenant's information as part of the totality of circumstances and Peyton informed the SAU officers, "the supposed original call [] was a 491 (kidnapping) DV (domestic violence), but it **<u>ended up being no crime whatsoever</u>**, so it's just a straight 901 Xray at this point." (*Id*. at 106:2-4, 106:18-107:15; Ex 18 at 01:25-01:38.) Placing his credibility at issue, Peyton testified that he did not receive information that there was no crime, or that Parra did not actually kidnap or commit domestic violence on Ms. Garcia. (Ex G at 36:25-37:8, 44:17-19.) Peyton admitted that the analysis of whether to use force would "absolutely" change if Parra was not under arrest for kidnapping and domestic violence. (*Id*. at 65:8-13.) As having a mental health crisis is not a crime. (*Id*. at 42:7-8.)

On Sgt. Walsh's direction, SAU Officers took tactical positions around the car to prevent Parra from escaping while maintaining cover, with freedom to tactically reposition. (Ex F at 45:19-46:13, 52:10-12.) SAU Officers wore tactical gear including bulletproof vests and helmets, and gas masks equipped with speakers to communicate with each other and Parra. (*Id*. at 42:14-43:22; Ex G at 29:6-8, 53:13-15, 97:17-20.) Walsh and Wuertz created a tactical plan to contain and negotiate with Parra then use gas to force him to exit the car and take him into custody. (Ex F at 38:20-38:9.) With a vehicle blocking the door, Ortiz instructed Parra to put the knife down, crawl out of the window and put his hands on the patrol vehicle hood, acknowledging that Parra feared the police. (Ex F at 54:13-25, 88:1-12, 90:19-21; Ex G at 115:11-19, 116:18-117:2.) Ortiz assured Parra that if he dropped the knife and crawled from the window he would not be hurt. (Ex G at 114:5-14,

115:6-10.) Parra complied, but the Officers still shot him. CS gas was deployed from the armored vehicle on Walsh's order. (Ex H at 18:6-19.) Parra complied with instructions to come out of the car without the knife. (Ex F at 61:16-62:1.) The gas deployment was successful, completely engulfing the interior and billowing out the windows, until Parra climbed out of the window. (*Id*. at 55:9-56:2, 66:14-16.) As Parra exited the window with visibly empty hands, head down and eyes closed, Paulson closed the distance, then Graber instructed officers, "Hit him, hit him!" followed by Officers immediately shooting Parra. (*Id*. at 62:19-21, 83:2-11, 92:12-18, 93:2-24, 94:21-22, 97:2-4.)

### 1.    Officer Paulson's Use of Excessive Force.

Paulson arrived at 7:00 am and knew that force had already been used on Parra and admitted that it was no longer a possible kidnapping-hostage scenario, Parra was alone in the car, and that it was mental health call as Parra was diagnosed with schizophrenia. (Ex F at 19:13-22, 20:19-23, 22:17-20, 36:17-19.) The purpose of taking Parra into custody was only to get medical attention for being a danger to self; Parra was not under arrest. (*Id*. at 36:24-37:2, 65:24-66:8, 87:15-25.) "While [Parra] was in the car, no" he was not an immediate threat to anybody; even within 10 feet officers were safe. (*Id*. at 29:13-30:13, 52:7-9, 85:11-25.) Even SAU disturbingly contends that if Parra merely fled, deadly force would be used. (*Id*. at 39:24-40:14.) Deadly force is only authorized if the subject is an immediate threat of death or serious bodily injury, not merely for fleeing. (*Id*. at 68:15-18, 69:1-5, 70:1-13.) Paulson had no information that Parra had ever verbally threatened anybody and never saw Parra attempt to physically harm anybody. (*Id*. at 27:25-28:24, 30:15-21, 66:12-13.) Paulson never saw Parra engage in any self-harm. (*Id*. at 31:3-14.) Paulson never saw anything that looked like a gun and believed Parra exited the car unarmed. (*Id*. at 32:14-16, 53:10-20.) Parra was later searched and no weapons were found. (*Id*. at 53:24-54:5.) Prior to the CS gas deployment, no officer even claims Parra attempted to flee. (*See Id*. at 31:21-23, 44:8-13.)

Paulson deployed three 37mm impact rounds aimed at Parra's stomach and buttocks. (*Id*. at 16:1-18, 50:8-21.) His first round was merely because Parra was in the

process of standing up on the vehicle hood. (*Id*. at 56:11-20.) Parra immediately reacted by wincing and curling in pain, then merely taking one step onto the windshield, Paulson fired again. (*Id*. at 56:3-10, 58:10-18, 94:9-25, 95:5-17; Ex G at 63:9-16.) Parra only moved to the roof of the vehicle after Paulson's second shot. (Ex F at Depo 58:6-9.) Seconds later Paulson fired his third round at Parra's buttocks as Parra was turning away, while impossibly claiming that Parra was moving towards Ghan. (*Id*. at 58:19-21, 59:3-23; Ex U, Helm Video, Paulson Force.) Paulson did not see anything in Parra's hands from 3-4 yards away during all his shots. (Ex F at 59:24-60:5, 60:23-25.)

Parra was not running and did not move towards any officer but was trying to avoid being struck by officer fire by moving away from the shots. (*Id*. at 62:8-10; Ex B at 63:18-64:4; Ex U, Helm Video, Paulson Force.) Parra never jumped off the vehicle towards any officer, but when he nearly fell after being struck by officers, Paulson lowered his ARWEN and put his left hand out to grab Parra. (Ex F at 62:11-13, 72:11-22, 97:19-98:18.) Paulson and Peyton fired all their shots within 2-3 seconds. (*Id*. at 97:9-12.) Paulson did not give Parra any commands or warnings prior to using force. (*Id*. at 52:16-18, 64:1-3.) Paulson was not even paying attention to what was said between negotiators and Parra, despite knowing that it could be important information to assess compliance. (*Id*. at 41:20-42:1.)

### 2. *Officer Peyton's Use of Excessive Force.*

Peyton was not equipped with a Taser or baton. (Ex G at 30:20-24.) Peyton knew the girlfriend was safe, had no information that Parra ever physically harmed her or anyone, or ever verbally threatened any person or officer, and never saw Parra attempt to threaten or harm anybody. (*Id*. at 33:21-24, 36:19-24, 37:9-38:5, 54:2-23, 55:8-10, 77:8-11, 77:22-25.) Peyton had no information that Parra had a violent history, never saw a gun or anything that looked like a gun and never received a report that anyone ever saw a gun. (*Id*. at 39:3-40:3, 40:12-15.) Peyton's irrational fear and insufficient training is shown by his claim that Parra was an immediate threat to officers and the surrounding populous when he was alone in the car. (*Id*. at 50:9-17.) Parra was contained in the empty parking lot; no bystanders nearby; homes either evacuated or empty; Peyton never saw Parra break into

any houses, did not have any information that Parra ever broke into someone's house, had no information that Parra ever ran through the street. (*Id*. at 51:4-20, 78:1-11, 79:13-18, 83:9-12, 111:21-112:12.) Parra never attempted to flee. (*Id*. at 47:6-12, 49:17-50:1.)

After the gas was deployed inside the car, the smoke was so heavy "billowing inside the vehicle," Peyton stated, "No visual." (*Id*. at 121:3-122:7; Ex 18 at 02:16:13-03:16:41.) Parra immediately started coughing and climbed out of the window. (*Id*. at 115:3-5, 122:20-22; Ex 18 at 02:16:49-52.) In compliance, Parra exited the car without the knife. (Ex G at 109:6-22, 111:2-3.) Then Parra "mov[ed] away from his vehicle that was engulfed in gas." (*Id*. at 93:18-94:1.) After being shot by Paulson on the hood, Parra moved south to the roof. (*Id*. at 94:2-11.) Parra hands were visibly empty; he was visibly unarmed and never reached for a weapon. (*Id*. at 41:6-9, 57:1-9, 57:18-58:12, 123:10-12.)

Approximately 1-2 seconds from Paulson's shot, Peyton opened fire with his 37mm, aiming at Parra's pelvic area. (*Id*. at 11:18-22, 58:16-23, 59:2-3, 63:6-11.) Parra was shot in the groin from 8-10 feet, then Peyton assessed, closed the distance, and fired again from approximately 6-8 feet. (*Id*. at 59:11-19, 60:20-24, 87:23-88:13; Ex V, Helm Video, Peyton Force.) Prior to being shot, Parra was merely walking. (Ex G at 61:18-25.) After being shot, Parra curled up in pain again, then moved north away from Peyton. (*Id*. at 94:12-15, 95:23-96:11.) Further, Ghan made the decision to position himself on that precarious and unstable shooting platform, despite the armored vehicle turret providing elevated position. (*Id*. at 89:18-90:7, 117:8-118:14, 119:11-23.) If the officers felt that the armored vehicle would give them a tactical advantage they could have moved it. (*Id*. at 120:20-121:2.) Peyton also did not give Parra any commands or warnings prior to using force and was not paying attention to the negotiators' instructions. (*Id*. at 62:21-63:5, 112:18-23.) Yet still, Peyton was later promoted. (*Id*. at 7:8-11.)

### 3.    Officer Steele's Use of Excessive Force and Deadly Force.

The most important factor to consider in evaluating the reasonableness of an officer's use of deadly force is whether the subject posed an immediate threat of death or serious bodily injury to others at the time of the shooting. *Gonzalez*, 747 F.3d at 793. A

jury could watch the videos and interpret that Parra never made a threatening gesture. *See Estate of Lopez*, 871 F.3d at 1020-21; *see Nehad*, 929 F.3d at 1134 (considering police practices expert opinion, a reasonable factfinder could find that the subject did not pose a danger to anyone); *see Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016) ("Viewing the facts in the light most favorable to Plaintiffs for the purposes of summary judgment, the alleged various uses of impact blows constitute lethal force."); *Young*, 655 F.3d at 1162 (noting head strikes are deadly force). Here, Steele's intentional shot to Parra's face is an undeniable use of deadly force. *See*, *e.g.*, *Blanford*, 406 F.3d at 1117-19. It is well-established that deadly force is "extreme," unmatched, and should only be used in limited circumstances. *Landeros*, 837 F.3d at 1011. "[T]he Constitution does not tolerate the use of lethal force to 'seize and unarmed, nondangerous suspect…'" *Id*. at 621 (citing *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011)) Here, Steele used deadly force and Parra was not an immediate threat at all.

Parra was still alone in the car when Steele arrived prior to 8:00 am. (Ex H at 12:21-23, 49:25-50:2, 58:7-10.) Steele had no information that Parra physically injured anybody and understood that this was a mental health situation. (*Id*. at 50:10-12, 55:5-8.) Yet, Steele claimed that if the unarmed Parra fled containment, he would be shot with lethal force. (*Id*. at 61:4-8.) Despite being told that there was no crime, Steele testified that he does not "recall ever being told there was no crime," also placing his credibility at issue. (*Id*. at 55:2-4.) Steele deflated the tires of the car and vehicles boxed in Parra minimized the ability to maneuver. (*Id*. at 76:9-25.) Within seconds of the gas deployment, Parra began to cough and could barely be seen through the heavy smoke until Parra quickly climbed out of the window and on top of a patrol vehicle. (*Id*. at 29:6-13, 80:22-4.) Steele heard ARWENs firing and heard Edgar grunting as he took the rounds. (*Id*. at 81:23-82:2.)

Steele fired 2 rounds from his ARWEN, first from 5-10 yards from Parra and second at 5-6 feet. (*Id*. at 13:1-3, 13:12-13, 14:17-21, 46:7-9.) Steele did not see anything in Parra's hands and was not concerned with Parra's hands because he had cover. (*Id*. at 29:14-15, 31:22-23.) Steele did not give a warning prior to using force. (*Id*. at 13:17-19.)

It is undisputed that Steele's first round struck Parra in the face causing profuse bleeding. (*Id*. at 35:11-36:3.) However, in direct contradiction to Steele's Motion and Declaration – Steele's Report, Testimony, and Video tell a different story. Steele claims that he was aiming at Parra's thigh, but the round happened to impact Parra's face. (*Id*. at 34:6-25.) Steele originally reported that Parra was running towards him. (Ex 35, Attach D, Steele Report at 3.) Steele claimed that he was <u>tracking Parra's movement towards him when he fired one round</u>, *then* Parra fell to the ground. (Ex 35, Attach D, Steele Report at 3; Ex H at 68:20-22, 89:9-13.) If Steele is to be believed, tracking Parra's movement running toward him and aiming at Parra's thigh would only result in striking Parra's face as he fell, *if* Parra fell in Steele's direction – he did not. Steele's Motion and attempt to conceal his use of deadly force must be tested by a jury. Steele intentionally fired at Parra's face unreasonably believing that deadly force was authorized against an unarmed, non-dangerous, mentally ill man. (*See Id*. at 96:10-17; Ex X, Helm Video, Steele Force.)

The video cannot be disputed: the visibly unarmed Parra was not attempting to flee, he could not see, could barely breathe, and merely moved away from Officers' constant fire, not knowing what to do after he just complied with commands and was shot anyway; Steele was north of Parra; Parra was moving west; Parra had already started to slip on the vehicle because of the gas particles, falling west; Steele waited for Parra to fall, tracking him, and intentionally fired his first round at Parra's face. (Ex X, Helm Video, Steele Force.) If Steele were aiming for Parra's thigh, no leading point of aim would be necessary. With all Steele's claimed training and experience, a red dot sight for accuracy, from 10-15 feet, with a 165 mph round accurate in a group of less than 10 inches – Steele had to have been aiming at Parra's face. (Ex Z, DeFoe Decl ¶¶18-19.) Defendants erroneously claim to be well trained SAU members and yet shoot a man in the groin and face, and while unconscious, all while unarmed, in the same incident – where there was no crime.

Challenging Steele's credibility even more is his claim that he shot Parra on the ground because Parra raised his hand as if to throw something at him. (Mot at 5:28-6:1.) It strains credulity to claim that force is appropriate against an obviously *unconscious* person

with a *visibly empty hand* raised *as if to throw nothing*. Parra was unconscious on the ground, and Steele went to shoot a second time regardless of whether Parra had a knife or not. (Ex H at 47:1-14.) After the shooting, Peyton yelled out, "Head injury!," seeing a lot of blood on the ground and on Parra's face showing the severity of his wounds. (Ex G at 127:2-12; Ex F at 100:20-101:2.) Parra was lying face-up on the ground, bleeding from the head, not moving, and unconscious, when Paulson grabbed Parra's limp arm, dragged him away from the car, and rolled Parra to his stomach. (Ex F at 74:15-75:24, 99:1-24; Ex G at 124:6-9, 125:2-8, 126:22-24; Ex 18 at 02:17:17-28.) Once Parra was rolled over, he woke up and was "screaming appropriately" from the pain and his mental episode. (Ex F at 100:4-6; G at 95:9-21.) Then officers zip-tied Parra and carried him away by his elbows and feet. (Ex G at 131:3-11' Ex Y, Helm Video, Custody.) The only person injured in this incident was Parra. (Ex F at 28:13-15.) Every *Graham* factor weighs heavily towards finding that Paulson, Peyton, and Steele used excessive force against Parra. Accepting all facts and reasonable inferences in Plaintiff's favor, there was no crime at issue, Parra was not a threat to anyone at the time, Parra was not resisting or attempting to flee, there were reasonable alternatives including mere communication, no warnings was given, and Parra was emotionally disturbed. (Ex U-Y, Helm Videos; Ex Z, DeFoe Decl ¶¶16-19.) Therefore, a jury could find that Defendants' uses of force were excessive and unnecessary.

## VI. THE LAW IS CLEARLY ESTABLISHED THAT FORCE AGAINST A NON-THREATENING, MENTALLY ILL MAN, IS EXCESSIVE

Qualified immunity has two prongs: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that right was "clearly established" at the time. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). At this stage, the Court must assume the following facts for its analysis: no crime was committed; Parra was not an immediate threat of harm; never attempted to harm anyone; never attempted to flee; never verbally threatened anyone; Parra needed mental health care; while Defendants used force without warning and while reasonable alternatives were available. Constitutional violations clearly occurred as described above

1    and qualified immunity should be denied in this case for two principal reasons. First, taking

2    Plaintiff's facts as true, including all reasonable inferences, Defendants' conduct obviously

3    violated clearly established law. Second, there are disputed issues of material fact.

4    This is an obvious case clearly established by the Supreme Court in *Graham and*

5    *Garner* standing for the principle that officers may not use force, without warning,

6    including 9 impact rounds, 60 pepper ball rounds, 2 Tasers, 2 MK-9 canisters, and CS gas;

7    against a subject who had not committed a crime, was alone in a car suffering a mental

8    health crisis, had not harmed or attempted to harm or threaten anyone, was not an

9    immediate threat to anyone, had not attempted to flee, and showed acts of compliance,

10   especially where the reasonable alternative of de-escalation and communication was all

11   that was necessary. Shooting an unarmed suspect who no longer poses an immediate threat

12   is an "obvious" case in which qualified immunity does not apply. *See Aguirre v. Cnty.of*

13   *Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (discussing pre-2022 precedent).

14   It is clearly established that officers cannot use impact rounds against individuals

15   who are not aggressive or combative. *See Jones*, 837 F.3d at 1131-32; *Glenn*, 673 F.3d at

16   871-72; *Deorle*, 272 F.3d at 1277; *Bryan*, 630 F.3d at 825. Kinetic rounds are "intended to

17   induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch

18   or baton strike." *Glenn*, 673 F.3d at 871. Although no designed to cause death or serious

19   bodily injury, they are less lethal as opposed to non-lethal because they can **cause serious**

20   **injury or death** "if they hit a relatively sensitive area of the body, such as [the] eyes,

21   throat, temple or **groin**." *Id.* In *Deorle*, the Ninth Circuit "observed that the euphemism

22   'beanbag' 'grossly underrates the dangerousness of this projectile,' which 'can kill a

23   person if it strikes his head or the left side of his chest at a range of under fifty feet.'" *Id.*

24   at 871-72 (citing *Deorle*, 272 F.3d at 1297 & n.13). Likewise, "[chemical agents are]

25   designed to cause intense pain and inflicts a burning sensation that causes mucus to come

26   out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary

27   paralysis of the larynx, as well as disorientation, anxiety, and panic" making chemical

28   agents, and impact weapon strikes, "a sufficiently serious intrusion upon liberty that must

be justified by a commensurately serious state interest." *Young*, 655 F.3d at 1162 (*quoting Headwaters*, 240 F.3d at 1199-1200. In *Young*, the Ninth Circuit held that officers are not entitled to qualified immunity for pepper spray and impact strikes where the threat of safety to officers was negligible, subject did not pose a threat and was not actively resisting or attempting to flee, the crime was not "severe", and there were feasible less intrusive measures. 655 F.3d at 1166-67 (relying on *Blankenhorn*, 485 F.3d 463 and *Headwaters*, 276 F.3d 1125). Defendants were on notice that every use of force here was unreasonable.

"A review of the decisional law at that time indicates that it was clearly established then that 'where no immediate threat to the safety of others exists, law enforcement officers are required to consider less intrusive tactics' before using 'aggressive tactics to subdue a mentally unstable individual who is resisting arrest.'" *Howell v. Mun. of Anchorage*, 646 F. Supp. 3d 1047, 1076 (D. Alaska 2022) (*citing Alford v. Humboldt Cnty.*, 785 F. Supp. 2d 867, 882 (N.D. Cal. 2011)). "In addition, intentionally pepper-spraying [a subject] for no legitimate law enforcement reason would likely constitute an 'obvious case' of excessive force 'where *Graham* and *Garner* alone offer a basis for decision.'" *Morales*, 873 F.3d at 826. "Under these circumstances, viewing the facts in the light most favorable to plaintiff, no reasonable officer would believe that it was lawful to: without proper warning, use force against a suspect who was neither threatening nor actively resisting the officers," and complied with officer commands to crawl out of the car unarmed in an effort to surrender, who had not committed a crime, was suffering a mental health crisis; deliver six 37mm rounds including to his groin and face, then follow up with an additional round while unconscious on the ground; while the subject could not see and had difficulty breathing; all after officers already shot him twice with 40mm rounds, emptied two MK-9 OC canisters on his face, pepper balled him 60 times, Tased him twice, and CS gassed him in a confined area. *See Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1011 (C.D. Cal. 2019); *see also LaLonde v. Cty. of Riverside*, 204 F.3d 947 (9th Cir. 2000).

The law gave Defendants fair warning that force is unconstitutional against someone who does not present an immediate threat to the safety of officers or others and

certainly cannot use deadly force against a person who is not an immediate danger of death or serious bodily injury. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts in this Circuit and others routinely deny qualified immunity to officers who fire their weapons in far more stressful situations such as encounters with suspects seen holding a gun. *See Curnow*, 952 F.2d at 324-25 (denying qualified immunity where the suspect had a gun but was not pointing it at the officers); *Ting v. United States*, 927 F.2d 1504, 1508-11 (9th Cir. 1991) (denying qualified immunity where a felony suspect dropped his gun); *Harris*, 126 F.3d at 1203 (denying qualified immunity where the suspect had committed a violent crime in the immediate past); *Torres*, 648 F.3d at 1128; *Adams*, 473 F.3d at 994 (denying qualified immunity where suspect's non-dangerousness and officer's failure to warn before shooting placed the case squarely "within the obvious"); *Brosseau*, 543 U.S. at 197-99 (reaffirming *Garner* as sufficient "fair warning" in "obvious" cases).

Based on Plaintiff's facts and all reasonable inferences, Steele especially is not entitled to qualified immunity. *See C.V. v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016) (deadly force is not objectively reasonable even when the subject had a gun, where subject was complying); *Aguirre*, 29 F.4th at 629 (where subject posed no immediate threat, "'general constitutional rule' applies 'with obvious clarity'" rendering the officer's force objectively unreasonable); *Strickland*, 69 F.4th at 620 (citing *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1001 (9th Cir. 2020)) ("it is 'clearly established that shooting a nonthreatening suspect would violate the suspect's constitutional rights").

Plaintiff submits that the above cases are sufficient to put the officers on notice that their conduct violated the Constitution. Nevertheless, officials are not entitled to qualified immunity simply because no case with materially similar facts has held their conduct unconstitutional. *See Hope*, 536 U.S. at 739-41; *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). "In excessive force cases, the inquiry remains whether 'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] a mistake to the contrary would have been unreasonable.'" *Id*. at 781 (*quoting Drummond*, 343 F.3d at 1060).

1    Further, disputed issues of material fact also preclude qualified immunity. *See*

2  *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Glenn*, 673 F.3d at 870, fn. 7 (*citing Espinosa*

3  *v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)); *Cunningham v. City of*

4  *Wenatchee*, 345 F.3d 802, 809 (9th Cir. 2003); *Knox v. Southwest Airlines*, 124 F.3d 1103,

5  1109 (9th Cir. 1997) (no qualified immunity where there are triable issues of fact). Because

6  of the number of disputed facts bearing on reasonableness of the force, granting qualified

7  immunity would violate well-established precedent. *See Brosseau*, 543 U.S. at 206

8  (Stevens, J., dissenting) (The reasonableness of an officer's belief "...is a quintessentially

9  'fact-specific' question, not a question that judges should try to answer 'as a matter of

10  law..."); *Anderson*, 483 U.S. at 641. Here, the disputed facts preclude qualified immunity.

11    Finally, in *Longoria v. Pinal County*, the Ninth Circuit reiterated that "[w]here the

12  facts are disputed, their resolution and determinations of credibility 'are manifestly the

13  province of a jury.'" 873 F.3d 699, 710 (9th Cir. 2017) (quoting *Wall v. Cnty. of Orange*,

14  364 F.3d 1107, 1110 (9th Cir. 2004)); *see also Lopez*, 871 F.3d at 1018 (affirming denial

15  of qualified immunity where officers gave differing accounts as to material facts and

16  holding that where the state of the law at the time of the incident provides fair warning, the

17  level of specificity required by recent Supreme Court jurisprudence is satisfied). This is an

18  obvious case of excessive force; still, Ninth Circuit authority puts Defendants on notice

19  that their conduct was excessive. Thus, Defendants' Motion should be denied in full.

20  **VII.  DEFENDANTS FAILED TO SUPERVISE OFFICERS AND INTERVENE**
21  **ON THE USES OF EXCESSIVE FORCE FOR OVER THREE HOURS**

22    "Liability under [§]1983 arises only upon a showing of personal participation by

23  the defendant. A supervisor is only liable for the constitutional violations of ...subordinates

24  if the supervisor participated in or directed the violations, or knew of the violations and

25  failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations

26  omitted); *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (explaining

27  a supervisor liability "if there exists either (1) his or her personal involvement in the

28  constitutional deprivation, or (2) a sufficient causal connection between the supervisor's

wrongful conduct and the constitutional violation." (quotation marks and citation omitted)); *King v. Cty. of Los Angeles*, 885 F.3d 548, 559 (9th Cir. 2018) (same). "'The requisite causal connection can be established…by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Rodriguez*, 891 F.3d at 798 (*quoting Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (failure to intervene to stop alleged violation sufficient to establish liability). Supervisor Defendants Beauchamp and Walsh[1] were responsible for all the force used in this incident.

Beauchamp was personally involved in the escalation of tactics that had a direct causal connection with the constitutional deprivations. Beauchamp arrived at 6:11 am prior to any force, present when the kidnapping and domestic violence was investigated by officers and set up the containment. (Ex 15 at 00:00-01:00.) Beauchamp communicated to officers that according to the girlfriend there is no gun. (*Id*. at 02:10-30.) Beauchamp got the houses evacuated. (*Id*. at 02:40-03:25.) Before the first shot was fired, Beauchamp contemplated hitting the car from the front and moving up there was "no crime on [Parra] whatsoever." "[N]o kidnapping, he's just schizophrenic, and she's trying to get him help." (*Id*. at 06:55-07:10.) A jury could find that Beauchamp was present for and saw all the patrol officer force used against Parra, as seen and heard on his video. (Ex 15 at 00:00-52:30.) Beauchamp specifically participated in the MK-9 deployment, handing Roberts the second canister to unnecessarily spray Parra. (*Id*. at 37:30-38.) Beauchamp also created the Taser action team and instructed the officers to simultaneously deploy the Tasers at Parra. (Ex A at 31:2-4; Ex D at 39:11-15; Ex 28, ¶39; Ex 29, ¶38.) Evidencing general incompetence and failed supervision, based on Beauchamp's delivered plan, the Taser team believed they were being instructed to Taser Parra (Ex A at 40:5-11, 68:3-25) while Beauchamp claims that he merely gave them "a preparatory command." (Ex 29 at ¶42.)

---

[1] Although Ortiz allowed force to be used against Parra while attempting to de-escalate, for strategic reasons, Plaintiff voluntarily dismisses his claims against Ortiz.

Beauchamp also was charged with deploying CIT to the scene and failed to do so in a timely manner prior to using force. (Ex 29 at ¶33; Ex 15 at 46:05-11.) Beauchamp admits that he was the supervising Patrol Sergeant. (Ex 29 at ¶11.) Yet, officers had no idea who the actual supervisor was or what the tactical plan was. (See, e.g., Ex D at 16:16-19, 17:21-25.) Beauchamp, a Sergeant at the Professional Standards Bureau and a POST General Inspector (Ex 29 at ¶¶4, 10), was present for all the force used against Parra but did not intervene on the uses of excessive force or discipline any officers thereafter. (Ex 15 generally.) Beauchamp knew of the violations and failed to act to prevent them, and took no action as a supervisor to help and protect or ensure that negotiations took place without officers continually using force against Parra.

Finally, SAU Supervisor Walsh was personally involved in the escalation of tactics that had a direct causal connection with constitutional deprivations. Walsh "was running the scene." (Ex 36 at ¶14; Ex H at 18:16-19; Ex F at 37:9-11; Ex G at 21:24-22:2.) Walsh knew there was no crime but that this was a mental health call. (Ex 36 at ¶18.) Walsh knew the patrol officers had already deployed force on Parra. (Ex 36 at ¶24.) Walsh was charged with giving SAU Officers tasks and disseminating information; Walsh assigned tactical positions; and Walsh created the tactical plan. (Ex H at 53:12-19; Ex F at 38:20-39:2, 45:23-26:1; Ex 36 at ¶30.) Walsh told SAU to use deadly force merely if Parra fled. (Ex F at 40:10-14.) Walsh instructed Steele to deflate the tires. (Ex 22 at 03:32-04:21; Ex 36 at ¶53.) Walsh commanded the gas deployment. (Ex 22 at 09:00-10:50; Ex H at 18:6-19; Ex 36 at ¶44.) Walsh watched and did not intervene on Officers' uses of excessive force. (Ex 22 at 10:55-11:15.) After the excessive force, Walsh began to laugh and joke with another officer about the situation, then turned off his camera. (Ex 22 at 11:50-12:09.) Walsh was notified of the officers' uses of force after the incident. (Ex H at 73:18-24; Ex F at 70:15-20.) And Walsh got his team together to discuss the officers' uses of force. (Ex F at 71:12-16.) Yet, Walsh was promoted to Lieutenant. (Ex F at 51:22-23.)

Defendants are liable as integral participators "if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those

whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022); *Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004) (liable when they fail to intervene). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation," [b]ut it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn*, 485 F.3d at 481 n.12. Beachamp, Roberts, and Walsh were far more than mere bystanders; directly supervised subordinates; devised plans; set in motion a series of acts that led to excessive force; and knew of and acquiesced to subordinates' conduct. These supervisors cannot escape their direct involvement in every part of this incident as recorded on every BWC submitted by Defendants and admitted in their individual Declarations.

## VIII.  PLAINTIFF'S STATE LAW CLAIMS SURVIVE

### A.    Defendant City is Not Immune and Is Vicariously Liable

Defendant City's reliance on *Ryan v. Napier*, 245 Ariz. 54 (2018) and A.R.S. §12-820.05(B) is greatly misplaced. The *Ryan* Court specifically stated, *if* the officers intentional use of force was "consequently determined to be aggravated assault [] the [City] would be immune from liability, unless he knew that [the officer] had a propensity to act as he did." *Ryan*, 245 Ariz. at 61. There is no evidence that any officer was even charged or convicted with a felony. Defendant City's desperate attempt to escape liability fails. Further, the City remains vicariously liable for the conduct of its officers. Thus, there is no need to name and serve a claim on each officer where City is liable under respondeat superior for all the wrongful conduct of its officers. The Supreme Court of Arizona in *Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 255 Ariz. 95 (2023) is controlling here. The Court "overrule[d] *DeGraff* and its progeny to the extent that these cases suggest that dismissing a claim with prejudice against an employee for reasons unrelated to the merits of the claim requires the court to also dismiss a respondeat superior claim against the employer." *Id*. at 106. The City of Phoenix attempts to prevent victims

of police violence from pursuing their claims by refusing to accept service on behalf of their officers and refuse to make the officers available for personal service. Accordingly, Parra named the officers in the body of the Notice of Claim to the City putting all officers and City on notice of the claims against them for their obvious and malicious wrongdoing against Parra. Whether the individual officers are named as Defendants under the state law claims has no effect on their liability under the federal law claims. The City admits that all the officers were acting within the course and scope of their employment with City have defended them accordingly. In Arizona, an employer may be held vicariously liable under the doctrine of respondeat superior for the negligent acts of its employee acting within the course and scope of employment. *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.*, 197 Ariz. 535, 540 (App. 2000). Here, there is no dispute that Defendants were on-duty police officers acting within the course and scope of their employment and the City is liable for their misconduct. Therefore, the City remains liable for all the officers wrongful conduct, named or unnamed, claim served or unserved, including all involved officers on scene. *See Id*. at 105-07; *and see Wiggs v. City of Phoenix*, 198 Ariz. 367, 369 (2000).

### B.    Plaintiff's Battery and Negligence Claims Survive

Plaintiff is entitled to trial on his claims for battery and negligence for the same reasons Defendants are liable for excessive force, supervisor and municipal liability. (See Sections V-VII, IX, *supra*.) Specifically, Defendants were negligent in their lack of planning, lack of collecting and disseminating information, lack of preparedness and training in tactics and weapons and dealing persona suffering a mental health crisis, by escalating the situation, by not giving warnings, and by failing to employ reasonable alternatives. It is well-established that an officer commits a battery when he exceeds his lawful right to use force. Arizona's justification statutes (A.R.S. §13-409, §13-410) mirror the Fourth Amendment standard for the use of force, and excessive force therefore removes the officer from the protections of §13-409. *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1016 (D. Ariz. 2012). Thus, Defendants' use of excessive force necessarily establishes

battery. Further, Plaintiff's negligence claim is also based both on Defendants' pre-shooting tactics, the scope of their failed tactics, their uses of unnecessary force, including to the groin and face. Justification is unavailable as a defense to the tort of negligence where defendants were negligent in ascertaining the facts before using force because the statute governing the justification defense did not govern the negligent misperception of fact contributing to an officer's decision to use force. *See Ryan*, 243 Ariz. 277. Finally, genuine issues of material fact exist as to whether the use of force was unreasonable, which precludes granting summary judgment under Arizona law. *See Atencio v. Arpaio*, 161 F.Supp.3d 789 (D. Ariz. 2015). Moreover, if a presumption applies, the burden only shifts to the plaintiff to produce evidence to rebut the presumption, although the defendant retains the burden of persuasion. *See Napier*, 245 Ariz. 54.

Defendants unnecessarily aggressive behavior, in conjunction with their laughing after force was deployed, evidences their negligent failure to follow policy and training and willingness to use excessive force without a legitimate law enforcement objective. Roberts' overall negligent conduct also cannot be understated. Roberts began the incident, negligently setting the tone for his subordinates, displaying unprofessionalism and aggression to the supposed victims. (Ex 10 at 00:30-06:40.) Roberts was the initial supervisor on scene yet failed to communicate a plan to officers. (Ex A at 7:17-24.) Roberts repeatedly failed to disseminate important information to officers. (See, e.g., Ex B at 13:24:14:12, 34:6-11, 42:19-24; Ex C at 18:11-20, 19:14-18, 26:9-12.) Roberts knew that Nelson planned to shoot Parra with the 40mm if he walked towards officers and did nothing to stop it. (Ex A at 46:8-13.) Roberts was the supervisor when the Tasers were deployed. (Ex A at 33:25-34:2.) Finally, Roberts maliciously emptied 2 MK-9 OC spray canisters right in Parra's face, while Parra had not committed a crime, as suffering from his mental illness, and alone in the car not threatening anybody. (Ex S, Helm Video, Roberts Force.)

Defendants' negligence is extensive, and their unreasonable force was obvious. Thus, Defendants' Motion should be denied in full.

/ / /

IX.     **PLAINTIFF'S MUNICIPAL LIABILITY CLAIMS SURVIVE**

A.     **Defendant City Ratified the Officers Unconstitutional Conduct**

*Monell* liability may attach when a final policymaker ratifies a subordinate's unconstitutional action and the basis for it. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *see generally Monell*, 436 U.S. 658 (1978). "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014) (quoting *Christie*, 176 F.3d at 1239), *rev'd on other grounds*, 135 S. Ct. 1765 (2015). The City clearly ratified Defendants force against Parra. (Ex L at 5-8; Ex M at 2, 6, 8; Ex Z, Decl. of DeFoe ¶20.) Despite the department reviewing the force to determine whether it was within policy or not, nearly two years after the incident Defendants were not informed of the results. (Ex A at 55:13-18; Ex B at 17:4-8, Ex C at 67:25-68:11, Ex D at 63:4-10; Ex D at 73:19-24; Ex G at 14:16-20.) As a result of this incident, Defendants did not undergo any additional training, did not receive any retraining, and no policy or training updates were made. (Ex A at 55:19-56:7; Ex C at 68:13-15; Ex D at 63:18-64:3; Ex F at 73:25-74:5; Ex G at 14:21-15:9.) Defendants were never reprimanded because of their conduct during this incident. (Ex C at 68:16-20; Ex D at 64:4-6; Ex G at 14:11-15.) It is undisputed that the City investigated the force, including taking interviews of the involved officers, scene photos, reviewing videos, and conducting forensic analyses and found that the force, including shooting Parra to the groin and face, was within policy. Accordingly, summary judgment should be denied as to this claim.

B.     **Defendant City Failed to Adequately Train Officers regarding Tactics, Use of Force, Communication, De-Escalation, and Intervention**

A municipality may also be liable for the inadequacy of police training under §1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. at 388). Defendants' use of force, including deadly force, against Parra demonstrate the City's inadequate training of

1   officers. (Ex Z, DeFoe Decl ¶¶5-24.) The City's failure to provide adequate training was a
2   moving force behind Defendants' use of excessive force against Parra. Officers are
3   required to know and follow the use of force policy. (Ex E at 24:15-21.) However, a jury
4   could find City's inadequate training was a substantial factor in the repeated failures to
5   follow basic officer training and policy regarding dealing with a person experiencing a
6   mental health crisis, de-escalation, and the use of force as demonstrated in this incident.

7       Phoenix SAU is the busiest SWAT Team in the nation, where Steele alone has been
8   involved in tens of thousands of incidents. (Ex H at 42:23-25.) Which in his ten years'
9   experience, despite training 25-33% of the time, was involved in anywhere from 3-10
10  incidents per day, every day, with no days off. Just Steele has shot so many people with
11  the ARWEN he lost count. (*Id*. at 43:1.) Steele has been in an officer-involved shooting
12  previously resulting in death of the subject and has been the named defendant in "[a] lot"
13  of lawsuits, between 10-20. (*Id*. at 59:3-8, 85:20-21.) All of Steele's uses of force have
14  been found in policy including this incident. (*Id*. at 86:5-23.) Steele intentionally used
15  deadly force in this matter, violating basic officer training by shooting Parra in the face,
16  and has since ineffectively tried to avoid that truth. This comes to no surprise considering
17  SAU's inadequate training policies. The SAU team conducted a debrief/after-action
18  immediately following the incident, led by Walsh for the purpose of going "over lessons
19  learned,…what [officers] did good, what [they] did bad…[and] to discuss how [they] could
20  have done better." (Ex G at 21:12-23:2.) However, officers do not recall any lessons
21  learned or what the officers could have done better from the tactical debrief because it was
22  not recorded or documented in any way. (*Id*. at 23:3-24:1, 24:11-15.) Any lessons learned
23  must be memorized by officers and can only be passed on by informal discussion or on the
24  job training. (*Id*. at 25:23-26:13.) SAU did not create any best practices to employ in future
25  incidents as a result of this incident. (Ex F at 74:6-8.) There is no City standard for SAU
26  officers to carry a Taser, baton, pepper spray, or to require them to carry at least one less-
27  lethal option. (Ex G at 31:3-22.) There is a serious training and policy issue where each of
28  the SAU officers claims to be permitted to use deadly force against Parra merely for

1  fleeing. Especially where Paulson, for instance, does not seem to even know the definition

2  of deadly force without looking at the policy. (Ex F at 67:21-68:4, 70:1-7.)

3      City does not provide formal training to officers on how to control their fears and

4  emotions, they just have "general conversations." (Ex B at 77:20-78:14.) This failure in

5  training alone is enough to proceed to trial. Officers who are ill-equipped to control their

6  fears logically will react out of irrational subjective fear using unnecessary force instead

7  of trained individuals prepared to use well-developed tactics in various situations. Policy

8  1.5 is also devoid of guidance on consideration of mental health of the subject despite the

9  Ninth Circuit requirement to consider it in the analysis. Defendants training documents

10  included as exhibits reveal their lack of training and minimal training regarding dealing

11  with a person experiencing a mental health crisis, de-escalation, and the use of force in the

12  two years prior to this incident. Survey of the videos and deposition testimony reveals

13  Defendants lack of knowledge and situational awareness about highly relevant information

14  demonstrating the failure of supervision and training. The depositions also include

15  numerous examples of officers not knowing or understanding basic training and policy.

16  For example, Majarucon appears to not be trained in the four considerations in using force

17  according to Policy 1.5, but only in something similar. (Ex B at 85:3-13; Ex 35, Attach D

18  at 3.) And Bennett believes there is no difference in the type of force permitted against a

19  subject who is merely passive resistant as opposed to active resistance. (Ex C at 62:22-

20  64:5.) An additional demonstration of a lack of training and willingness to not follow

21  policy, is that each Defendant Patrol Officers was required to write a supplemental report

22  because their original report was insufficient in describing what they did and why. (Ex D

23  at 33:22-24:2; Ex E at 20:1-5; Ex C at 50:4-25.)

24      Finally, officers are trained that pepper ball could be used on a subject who is merely

25  giving non-verbal cues indicating that he may be non-compliant. (D Ex 35, Attach D, at 1,

26  5.) This unconstitutional policy allows officers to deploy pepper balls for the slightest non-

27  compliance, no matter how non-threatening the subject. This unconstitutional policy also

28  has no instructions on minimizing how many rounds are fired, no instructions on

assessment or analysis, no guidance on adjusting the tactic if proven ineffective after the first dozen rounds. It leads to situations, like here, where an officer can erroneously believe that firing 60 pepper ball rounds at a non-threatening man experiencing a mental health crisis, with no crime, is permissible. (See Ex B at 135:15-17.) Had Officers been adequately trained disciplined, this incident could have been prevented. Taking the facts in the light most favorable to Plaintiff, a jury could determine that the City was deliberately indifferent in its duty to adequately train its officers. Therefore, summary judgment should be denied as to this claim.

### C. Defendant City Maintains Unconstitutional Customs, Practices, or Policies regarding the Use of Force and Deadly Force

*Monell* liability may also attach based on a policy of inaction that demonstrates deliberate indifference to constitutional rights. "[A] local governmental body may be liable if it has a policy of inaction, and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *Harris*, 489 U.S. at 388); *City of St. Lous v. Praprotnik*, 485 U.S. 112, 127 (1988). "[A] custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished." *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011). To show the existence of an unconstitutional custom, practice, and/or policy, Plaintiff need not present facts showing that similar conduct has repeatedly occurred in the past. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 fn. 11 (1986). This standard would require a "strained" reading of Supreme Court precedent. *Id.* "[A] single instance" would be sufficient if "the unconstitutional act was taken pursuant to a municipal policy." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-24 (1985)); *Pembaur*, 475 U.S. at 480 (counting it "plain" that municipal liability be imposed for a single decision). Moreover, "[a] policy can be one of *action or inaction*." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

As stated above, the City's failure to properly discipline Officers and failure to retrain them or make any policy changes indicate a long-lasting policy and custom of

failing to train Officers and ratifying their uses of excessive force and maintaining inadequate policies and training to prepare officers for what they are likely to face as law enforcement officers. (*See also*, Ex L at 6-8; Ex M at 2, 6, 8; Ex Z, Decl. of DeFoe ¶¶20-24.) The City's unconstitutional policy, custom, or practice includes failing to discipline or retrain police officers who engage in repeated use-of-force incidents and an informal unconstitutional custom, practice and policy of turning a blind eye to misconduct and untruthfulness of its employees. The City's failure to discipline officers for misconduct shows that the City maintains a culture where officer misconduct will go unchecked, despite the video evidence. A jury could find the City liable for its unconstitutional customs and policies. Therefore, summary judgment should also be denied as to this claim.

## X.    DEFENDANTS VIOLATED THE AMERICANS WITH DISABILITIES ACT BY USING EXCESSIVE FORCE INSTEAD OF REASONABLY ACCOMMODATING PARRA (i.e., DE-ESCALATION)

Title II of the Americans with Disabilities Act of 1990 ("ADA"), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. Officers "shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.152(a). Section 504 of the Rehabilitation Act ("RA") guarantees the same right of nondiscrimination to disabled individuals "under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). And, because Title II of the ADA was modeled on §504, "courts have applied the same analysis to claims brought under both statutes." *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (citations omitted); *see also Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (explaining that "[t]he standards used to determine whether an act of discrimination

1  violated the Rehabilitation Act are the same standards applied under the [ADA]").

2          Under Title II of the ADA, a plaintiff must show: "(1) he is an individual with a

3  disability; (2) he is otherwise qualified to participate in or receive the benefit of some

4  public entity's services, programs, or activities; (3) he was either excluded from

5  participation in or denied the benefits of the public entity's services, programs, or

6  activities, or was otherwise discriminated against by the public entity; and (4) such

7  exclusion, denial of benefits, or discrimination was by reason of [his] disability." *O'Guinn*

8  *v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (internal quotation marks and

9  citations omitted). It is undisputed that Parra has a qualified disability, as the officers knew

10  he was diagnosed with schizophrenia and had a mental health history prior to using force

11  against him. There are particular de-escalation tactics that are afforded to persons like

12  Parra, which Defendants failed to employ. Defendants' conduct, including lack of patience,

13  laughter and insult throughout the incident because of Parra's mental health condition,

14  shows that Parra was excluded from these reasonable tactical accommodations based on

15  his disability. Defendants claim Parra was a danger to himself, but Defendants were the

16  only ones who harmed him over the course of 3 hours. Had Defendants employed proper

17  de-escalation tactics considering Parra's mental health status, they would have refrained

18  from using any force against him, and merely gave him space and time, they would have

19  built a rapport and trust, and would have resolved this incident without using force

20  resulting in serious and permanent bodily injury to Parra – who had no committed a crime.

21  **XI.    PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES**

22          The Defendant officers' conduct throughout this incident, all documented on video,

23  was reckless and/or callous indifference to Parra's rights.[2] Punitive damages awards are

24  permitted on "various[] standards of negligence, recklessness, carelessness, or other

25  culpable conduct short of malicious intent." *Smith v. Wade*, 461 U.S. 30, 45 (1983); *see*

26  *Larez v. City of Los Angeles*, 946 F.2d 630, 639 (9th Cir. 1991) (actual intent or malice not

27

28  _____

[2] Plaintiff hereby drops his claim for punitive damages under state law only.

1    required). "[O]ppressive conduct is [also] a proper predicate for punitive damages under

2    §1983." *Dang v. Cross*, 422 F.3d 800, 809, 815 (9th Cir. 2005) (holding that punitive

3    damages could be awarded if the officer's conduct was oppressive). Here, a jury could find

4    that shooting under these circumstances satisfies one or more of the various standards for

5    awarding punitive damages. There was no crime, no verbal threat, no attempt to harm,

6    distance, cover, a perimeter, over 20 officers, Parra alone in the car suffering a mental

7    health crisis, no warning yet reasonable alternatives when Defendants fired over 60 pepper

8    ball rounds, 11 impact rounds, 2 Tasers, 2 MK-9 canisters, and CS gas – then laughed

9    about it as Parra is left blind in one eye.

10   ## XII.    CONCLUSION

11   For the reasons stated herein, Plaintiff respectfully request the Court issue and order

12   denying Defendants' Motion in full, denying qualified immunity, and finding that there

13   are disputed issues of material fact requiring jury determination on all claims.

14   Respectfully Submitted this 12th day of December 2025.

15   **LAW OFFICES OF DALE K. GALIPO**
16   **SMITH ALSTON DARNER & LEE**

17   By:   */s/ Dale K. Galipo*
          Dale K. Galipo
18        Jonathan D. Darner
          John M. Alston
19        Marcel F. Sincich
          *Attorneys for Plaintiff*

20

21

22   **CERTIFICATE OF SERVICE**

23   I certify that on December 12, 2025, I electronically transmitted the foregoing

24   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

25   Notice of Electronic Filing to all CM/ECF registrants.

26

27   By:   */s/ Cynthia Patino*

28